[Criminal No. 363.    Filed July 1, 1916.]

[159 Pac. 59.]

# ROBERT DAYTON TALLEY, Appellant, v. STATE, Respondent.

1. JURY—CHALLENGE TO PANEL.—Under Penal Code of 1913, section
1018, requiring a challenge to a panel to specify, plainly and dis-
tinctly, the facts constituting the grounds of challenge, and section
1017, providing that a challenge to a panel can only be founded on a
material departure from the forms prescribed for drawing and re-
turn of the jury, the challenge must set forth facts showing such
departure.

2. CRIMINAL LAW—APPEAL—TRANSCRIPT—CERTIFICATION.—Though the
reporter's transcript of the testimony is not approved by the trial
judge, yet, there being no suggestion that it is not correct, it may,
and in a capital case ordinarily will, though it need not, be con-
sidered.

3. CRIMINAL LAW—REVIEW—ADMISSION OF EVIDENCE—OBJECTIONS NOT
MADE BELOW.—Objection to introduction of garments worn by de-
ceased when he was shot, that they were not in the same condition
as when taken from his body, is too late when made for the first
time on appeal.

4. HOMICIDE—EVIDENCE—MOTIVE.—Evidence that deceased objected to
defendant keeping company with his daughter, though two years
before, is admissible to show motive, especially where defendant on
learning, just before the homicide, of the daughter's marriage, was
sensibly affected; remoteness of the evidence going only to its
weight.

5. HOMICIDE—EVIDENCE—MOTIVE.—As tending to show feeling, motive
or malice, a letter written by defendant to deceased's daughter,
shortly before the homicide, reflecting on deceased's lack of parental
care and affection for other daughters, and on their chastity and
virtue, is admissible.

6. CRIMINAL LAW—INTRODUCTION OF EVIDENCE—OBJECTIONS.—Objection that no time was fixed as to when the examination took place is not included in the objection of incompetency, irrelevancy and immateriality, to testimony of examination for weapons on the ground where the killing had taken place.

7. HOMICIDE—EVIDENCE—LETTERS SHOWING MOTIVE—RIGHT TO SHOW TRUTH.—Defendant, who had written a letter to deceased's daughter, complaining of deceased letting other daughters work and stay in disreputable places, was not entitled to testify to the character of such places or the conduct of such daughters, as, whatever they were, they could not mitigate or justify defendant in seeking out deceased and provoking the quarrel resulting in his death.

8. CRIMINAL LAW — WITNESSES — LEADING QUESTIONS — DISCRETION.— Permitting leading questions is ordinarily in the sound discretion of the trial court, reviewable only for clear abuse of such discretion.

9. CRIMINAL LAW — RECEPTION OF EVIDENCE — STRIKING OUT — DISCRETION.—Where two witnesses testified to defendant having said he would get even with deceased, and one of them, in answer to a leading question, before objection was made, testified that he also said he would get revenge on deceased, there was no abuse of discretion in refusing to strike out the latter answer; defendant's meaning, in view of his subsequent conduct, being the same whichever expression he used.

10. CRIMINAL LAW—MISLEADING INSTRUCTIONS.—In view of other instructions stating that included in the information was the charge of murder in the first and second degrees and of manslaughter, and that the verdict might be either of said degrees, or not guilty, as the evidence convinced the jury, the conclusion of an instruction defining murder in the first degree, "You will thus see that, included in the charge contained in the information, is that the defendant is guilty of murder in the first degree," could not have been understood as a statement that defendant was guilty.

11. CRIMINAL LAW—NEW TRIAL—NEWLY DISCOVERED EVIDENCE—CREDIBILITY.—Defendant not having claimed at the trial that deceased had a pistol, and all the witnesses having testified that defendant alone had a pistol, it was not error to refuse a new trial on affidavits of persons, who told no one of the occurrences till after the trial, one that she saw deceased throw up his hand with a pistol in it, and all that they heard deceased's wife say to deceased, "Don't kill him."

12. CRIMINAL LAW—NEW TRIAL—NEWLY DISCOVERED EVIDENCE—PERJURY.—The only thing that a witness testified to being that she was present when defendant made a threat against deceased, which was corroborated, affidavit of a person that after the conviction witness cried and said, "If you had sworn to a bunch of falsehoods against

.T. [defendant] as I did you would cry too," did not entitle defend-
ant to a new trial.

13. CRIMINAL LAW—NEW TRIAL—NEWLY DISCOVERED EVIDENCE—DILI-
GENCE.—It was defendant's duty to disprove, at the trial by his inti-
mates, the statement of a physician that the wound on his finger
was an old one on the day after he claimed it was inflicted by de-
ceased; so that he was not entitled to a new trial for alleged newly
discovered evidence thereon.

14. CRIMINAL LAW—NEW TRIAL—NEWLY DISCOVERED EVIDENCE—DIS-
CRETION.—Granting of a new trial for newly discovered evidence is
largely in the trial court's discretion, so that denial will be dis-
turbed only for abuse clearly disclosed in the record.

15. CRIMINAL LAW—NEW TRIAL—NEWLY DISCOVERED EVIDENCE—DILI-
GENCE.—New trial should not be granted for newly discovered evi-
dence, where diligence to discover and produce it at the trial is not
shown.

16. CRIMINAL LAW—NEW TRIAL—NEWLY DISCOVERED EVIDENCE—CUMU-
LATIVE EVIDENCE.—New trial should not be granted for newly dis-
covered evidence where it is purely cumulative or contradictory.

17. CRIMINAL LAW—NEW TRIAL—NEWLY DISCOVERED EVIDENCE—MA-
TERIALITY.—New trial should not be granted for new evidence unless
it is such as to render a different result probable.

18. HOMICIDE—DEGREE OF MURDER—SUFFICIENCY OF EVIDENCE.—Evi-
dence *held* sufficient to support a conviction of murder in the first
degree.

[As to when accused may testify as to motive or intent, see note
in 21 Am. St. Rep. 318.]

APPEAL from a judgment of the Superior Court of the
County of Gila. G. W. Shute, Judge. Affirmed.

Mr. Thomas E. Flannigan, Mr. H. M. Foster and Mr. F. C.
Jacobs, for Appellant.

Mr. G. P. Bullard, Attorney General, and Mr. Leslie C.
Hardy, Assistant Attorney General, for the State.

ROSS, C. J.—The appellant appeals from a sentence of
death, having been convicted upon the charge of murdering
Jesse G. Danner on the eighteenth day of November, 1913,
in Gila county, Arizona. He asks that the judgment be re-
versed upon numerous grounds. He interposed a challenge
to the panel of the trial jury, which was overruled by the
court. His reasons for challenging the panel were as follows:

"(1) That the jury has no legal authority to act.

"(2) That said jury was not drawn according to law.

"(3) That there is no law authorizing the drawing of said jury in the manner that such jury is drawn.

"(4) That any verdict rendered by said jury would be null and void."

Paragraph 1018 of the Penal Code of 1913 provides that:

"A challenge to a panel must be in writing, and be taken before a juror is sworn, and must specify, plainly and distinctly, the facts constituting the grounds of challenge."

Paragraph 1017 of the Penal Code of 1913 provides that:

"A challenge to a panel can only be founded on a material departure from the forms prescribed in respect to the drawing and return of the jury, in civil actions, or an intentional omission of the sheriff to summon one or more of the jurors drawn."

If it was intended to make the challenge in this case as indefinite and uncertain as possible, that purpose could not have been more effectively accomplished than by the language used. No "facts constituting the ground of challenge" are set forth. It is not shown that "a material departure from the forms prescribed in respect to the drawing and return of the jury" was had. If the jury "was not drawn according to law," the challenge could and should have shown wherein. The record shows that in obtaining the jury the court followed the provisions of paragraph 3542 of the Civil Code of 1913, by entering an order on its minutes directing the sheriff of the county forthwith to summon fifty good and lawful men of his county to serve as trial jurors; this order being based on the fact that there was no jury in attendance upon the court to try the case.

Paragraph 3542 has been the law of Arizona since 1901, it appearing in the Revised Statutes as paragraph 2807. The challenge failing to set forth any reason why the court was not authorized under said paragraph 3542 to order a special venire, we must presume that the court regularly pursued its authority, and that the facts, justifying the course taken by the court, existed.

A challenge was interposed to Juror Willis Miller upon the ground that he had "served as a juror on the regular list

within the previous twelve months in the same court.'' This challenge is based upon chapter 24, section 2, Session Laws of 1905. At the time of the trial, said section 2 had been amended by the elimination of the ground of exemption or disqualification interposed. See paragraph 3543, Civil Code 1913.

The other errors assigned are directed toward alleged errors committed in the course of the trial, and in order to consider them it will be necessary to look into the evidence. They are that the court erred in admitting evidence over the objections of appellant and in rejecting evidence offered by the appellant; in the giving of instructions and in refusing appellant a new trial upon newly discovered evidence.

The Attorney General has called our attention to the fact that the reporter's transcript of the testimony has not been approved by the judge who tried the case. He insists that under the rule heretofore made by this court in *Chavez* v. *Territory,* 14 Ariz. 107, 125 Pac. 483, *Perez* v. *Territory,* 14 Ariz. 163, 125 Pac. 483, and *Shaffer* v. *Territory,* 14 Ariz. 329, 127 Pac. 746, we are without authority to review the evidence for any purpose. However, we are not disposed to pursue that course in this case. Under strict law we might refuse to examine the evidence and confine our attention to the record for fundamental errors; but, in view of the fact that appellant has received the death sentence, we will treat the evidence as though it were regularly and legally before us. Besides, in the Chavez case this court said: ''This being a criminal case where the death penalty was awarded, we have most carefully scrutinized the record as it is presented to us. The indictment is sufficient, and the evidence in the case is ample to support the conviction.''

In the Perez case it was said: ''We have carefully examined the entire record presented. We think the instructions of the court fairly placed the law of the case before the jury, and we think the substantial evidence supports the verdict.''

In all capital cases this court has uniformly examined the evidence, whether approved by the trial judge or not, to see that the accused was protected in his rights and not unlawfully condemned. There has been no suggestion by the Attorney General nor anyone else concerned that the transcript of the evidence on file in this court is not correct, and

should it disclose that the appellant was not awarded all of the rights guaranteed to him under the Constitution and the law, in view of the fact that appellant's life is involved, we ought not to hesitate to reverse the case. On the other hand, if his rights were secured to him, the duty is equally obligatory to let the law take its course.

Out of the mass of testimony introduced the salient facts leading to the homicide and descriptive thereof are as follows:

The deceased, Jesse G. Danner, was the stepfather to Ethel Spencer, Ruby Johnson and Pearl Johnson, being the husband of their mother, Lily May Danner. The Danners and the appellant before coming to Arizona had lived at Anthony, New Mexico. While there the appellant paid attention to Ethel Spencer and kept her company for about two years. The deceased disapproved of his visits and companionship with his stepdaughter and requested appellant to cease visiting the Danner home. The Danner family, including Ruby and Pearl Johnson, moved to Miami, Arizona; Ethel Spencer remaining in New Mexico. Appellant also moved to Miami, and at the time of the tragedy was working at one of the mines there.

About September 6, 1913, appellant wrote a letter to Ethel Spencer, in which he advised her, if she could, to take her sisters away from Miami, because the Danners did not care as to the way they carried on; that one of the sisters was working in a shooting-gallery and the other was working in a restaurant; that these places were not places that decent girls should work; that there was a roadhouse between Miami and Globe; and that this roadhouse had been indicted because of letting Pearl and Ruby Johnson stay there all night. On the receipt of this letter, Ethel Spencer wrote to her mother and stepfather of its contents, but did not tell them its author.

On the evening of the 18th of November, 1913, about 8 o'clock, Mr. and Mrs. Danner and the appellant were at the home of Mrs. J. O. Lipps, in Miami. The deceased only remained for a few moments. After he had gone, someone remarked that Ethel Spencer was married. Mrs. Lipps further testified, when these remarks were made, appellant got up and left without saying a word. It could not have been very long thereafter when appellant appeared at the sleep-

ing apartments of Harry Hovey and asked him if he wanted
to go downtown. After they got started, Hovey said:

" 'Where are you going—to the dance?' And he said,
'Yes, I might dance some.' We went in and sat in the dance-
hall awhile, and finally he said, 'Let's go and get the mail,'
and I said, 'All right.' "

While at the dance appellant asked Price Lipps if Mr. and
Mrs. Danner came by, and was informed that they did.
Reaching the postoffice, Hovey went in the building for the
mail, and appellant remained on the outside at the door.
Just at this moment the deceased and Mrs. Danner entered
the postoffice, passing appellant at the door and meeting
Hovey as he was going out. Hovey says he told Talley that
there was no mail and suggested that they go, whereupon
Talley said, "Let's stick around." As the Danners passed
out of the postoffice, Talley said, using his own language,
"Mr. Danner, I would like to speak to you a minute."
Danner said, "All right," and walked up to him. "I said,
'Mr. Danner, I understand you suspicion that I wrote a let-
ter to Ethel about the way you are treating Pearl and Ruby?'
and he said, 'Yes.' Then I asked him did he know who wrote
the letter for sure, and he said, 'No,' and then I told him
that I wrote it, and what I wrote was the truth, and he re-
plied, 'You are a damn dirty liar,' and struck me almost at
the same time."

Mrs. Danner's testimony was practically the same as ap-
pellant's as to what was said by appellant and her husband,
but she says appellant struck her husband first, knocking
him down. A rough-and-tumble fight ensued, with the de-
ceased first underneath, then appellant. In the meantime
several people had gathered around, and Mrs. Danner was
begging them to separate the combatants. While the deceased
had appellant down and was severely punishing him, the
bystanders pulled them apart, and in doing so they both
raised to their feet. It was then that appellant drew a gun.
The deceased said to him, "Put up that gun and fight like
a man," at the same time grabbing hold of the gun, or the
hand in which it was held. The bystanders becoming fright-
ened, ran away, and as they left the fighting men they heard
a number of shots. Danner was assisted into the postoffice,
where it was discovered that he was mortally wounded. The

appellant stood in the middle of the street in front of the postoffice working with his pistol, some of the witnesses saying that he reloaded it, and others that he was working with the pistol and remarked that it would not work; that it was out of order. Danner died in a very few minutes after he was shot.

The appellant testified that at the time he shot deceased the latter moved his right hand down toward his hip, and that he thought he was going after a gun; thus he would justify his act in taking the life of the deceased upon the ground of self-defense.

The state introduced as part of its evidence some of the garments worn by the deceased at the time that he was shot, and this is assigned as error. It is contended by appellant that there was no evidence to show that the garments were in the same condition as when taken from the body of the deceased. No such objection to this evidence was interposed at the trial, the objection there being that such evidence was incompetent, irrelevant, immaterial and no part of the *res gestae*, and on the further ground that it had not been properly identified. The identification was absolute, the witnesses testifying that the garments were the identical garments worn by the deceased at the time he was shot. Appellant not having raised the point at the time that the clothing was not in the same condition as when taken from the body of the deceased, we think his objection now comes too late.

The prosecution was permitted over the objections of the appellant to introduce evidence of appellant's attachment to Ethel Spencer, showing that he kept company with her against the will and protest of the deceased. It is contended that this testimony should not have been admitted, because it was too remote and did not tend in any way to establish a motive or intent. With this contention we cannot agree. The evidence showed that appellant and Ethel Spencer kept company for about two years, and that after he left New Mexico and came to Arizona he kept up a correspondence with her, and that when he learned on the night of the 18th of November, 1913, at Mrs. Lipps' home, that Ethel Spencer had married, he was sensibly affected. The remoteness of the evidence might affect its weight, but not its competency. It can readily be seen that Danner's objection to his keeping

·company with Ethel Spencer would naturally be taken as an
.aspersion upon his character and social standing and a charge
of social inequality with his stepdaughter. The most natural
result of these reflections would be to arouse animosity and
ill feeling.

In *Leonard* v. *State*, 17 Ariz. 293, 303, 151 Pac. 947, 951, we
.said:

"It is always permissible to show previous troubles, when
in search of the real cause or motive actuating a party to the
·commission of crime, especially if the trouble is of recent
occurrence, or even somewhat remote in time, if it tends to
elucidate and throw light on the act constituting the crime
·or explain the reason of its commission."

It is also objected that the court erred in permitting the
prosecution to show the contents of appellant's letter, dated
:September 6, 1913, to Ethel Spencer, wherein he reflected upon
the lack of parental care and affection on the part of deceased
.and Mrs. Danner for their daughters, Pearl and Ruby, and
.also upon the chastity and virtue of these two girls. We
think the letter was proper evidence to show the feeling
.appellant entertained toward the deceased. If what he wrote
·was false, it was a malicious lie originating from the wicked
.and vindictive heart; if the contents of the letter were true
.and written in the interest and for the protection of the two
girls, still it indicated a feeling of resentment and condemna-
tion toward the deceased. In either event, it would tend to
.show feeling, motive or malice.

Jim Swearingen, deputy sheriff, testified, over the objec-
·tions of appellant, that he and Alf Edwards examined the
·ground for weapons, where the killing had taken place, and
·this was excepted to for the reason that no time was fixed
.as to when the examination took place. The witness stated
·that he was in the postoffice immediately after the shooting.
·The question propounded was, "What else, if anything, did
.yourself and Mr. Alf Edwards do with respect to the place
where the killing had been had?" This was objected to on
the ground of its incompetency, irrelevancy and immateri-
:ality, whereupon the court asked, "I understand this is all
within a period of a few minutes?" The county attorney
·replied, "All within a few minutes." The witness then said
:that he and Edwards took a light and searched the ground to

see what they could find. We think the objections interposed
did not go to the grounds as now urged against the evidence.
Besides, that no weapons were on the ground is supported by
the evidence of all the other witnesses, and that the only
weapon seen was the one in appellant's hands. Appellant
himself says that he did not see any weapon in the hands or
on the person of the deceased, nor did any other witness.

The appellant complains because the court sustained the
prosecution's objection to the introduction in evidence of a
letter written by Ethel Spencer to appellant in answer
to his letter of September 6, 1913. We have examined the
letter offered and fail to find therein anything bearing upon
the issues in the case. The appellant also complains that the
court erred in not permitting him, while on the stand, to go
into and explain the conduct of the two girls, Pearl and
Ruby, and the character of the places where they were em-
ployed. We think the court properly rejected such offer,
for it seems to us that it was immaterial as to what their
conduct was or the character of the places in which they
worked, as none of these things could possibly mitigate or
justify the act of appellant in seeking out the deceased and
provoking the quarrel that resulted in his death.

Pearl Johnson was a witness for the prosecution, and, on
being questioned concerning a conversation had with appel-
lant some two or three weeks before the eighteenth day of
November, 1913, concerning her stepfather and the letter
that appellant had written to Ethel Spencer, in answer
to a question, she testified that appellant "said my step-
father was the cause of him and my older sister not agree-
ing, and he said he would get even. . . . He said he would
get even with him. . . . He said two or three times those
words, two or three times during the conversation.

"Q. What words? A. That he would get even with him.

"Q. Did he say he would get revenge on him? A. Yes,
sir; he said that once."

After the last question had been answered, appellant ob-
jected and asked that the answer be stricken as leading and
suggestive. This ruling of the court refusing to strike is as-
signed as error. The matter of permitting leading questions is
ordinarily left to the sound discretion of the trial court, and
this discretion will not be disturbed unless clearly abused.

Another witness, Kate Rose, testified that in that conversation she heard appellant say, "I will get even with Mr. Danner." In the connection and under the circumstances under which appellant made the threat the question could not have made very much difference in the meaning of the two statements. Appellant's subsequent conduct toward Danner satisfies us that whether he said, "I will get even with Mr. Danner," or, "I will get revenge," he meant the same thing. Neither is it improbable that he did not use both terms. Besides, the question was answered before any objection was interposed. We do not think that the court abused its discretion in refusing to strike the answer. 5 Jones on Evidence, § 819.

The instructions of the court were very full, covering every phase of the case, and, when considered as a whole, we think they correctly state the law. Appellant has taken from them excerpts which he claims were prejudicial and erroneous. When considered alone, they might be so. One of the instructions of which complaint is made is as follows:

"You are instructed, gentlemen of the jury, that every murder which is perpetrated by means of poison or lying in wait, or by any other kind of willful, deliberate or premeditated killing, or which is committed in the perpetration of or attempt to perpetrate arson, rape, burglary or mayhem, is murder in the first degree. *You will thus see that included in the charge contained in the information is that the defendant is guilty of murder in the first degree.*"

It is said that the court by this instruction practically told the jury that the appellant was guilty. The italicized sentence is somewhat confused and involved, but we think the reasonable construction of it is that in the information was included the charge of murder in the first degree. Further on in the instructions the court told the jury that included within the information was the charge of murder in the first degree, murder in the second degree, and manslaughter. These different degrees of homicide were fully explained and defined by the court, and the jury were advised that the verdict might be according as the evidence convinced them—for murder in the first degree, or murder in the second degree, or manslaughter, or not guilty. It seems impossible

that the jury could have been misled by the language objected to.

We have examined the other exceptions to the instructions and do not think that they misstate the law.

Finally, it is contended that the trial court should have granted appellant's motion for a new trial upon the affidavits of newly discovered evidence. The principal affidavit relied upon was that of Mrs. W. B. Harris. She states in her affidavit: That she was at the postoffice and saw two men and a woman who seemed to be scrambling, the men appearing to be lifting the woman up. The woman seemed to be trying to keep the men apart with her hands; that thereupon she saw the smaller man of the two throw his hand up with a gun in it, and the woman immediately said to him: "For God's sake, don't kill him, Jesse; think of me and the children." That the woman repeated these words many times. The larger man appeared to be endeavoring to take the gun out of the hand of the smaller man. That she was within ten feet of the parties who were fighting. She states that she informed her husband what she had seen and heard, and that he forbade her telling any person, and that she had not told anyone except her husband until after the trial. W. B. Harris, her husband, made affidavit to the effect that he was in his house about sixty or seventy yards from the postoffice, having retired to bed, when he heard the same language; that when his wife told him what she had seen and heard he enjoined upon her not to repeat it; that he had told no one these things until after appellant was tried and convicted.

J. D. Kenney also made affidavit that he was about 150 feet from the postoffice when he heard the same language and also pistol shots; that in about ten minutes thereafter, seeing a large crowd congregate near the postoffice, he went to the postoffice and viewed the dead body of Jesse Danner; that he did not tell what he saw and heard to any person until after the trial and verdict, as he did not care to be a witness.

There were a number of eye-witnesses immediately present who testified as to what occurred after the fight began. They all state that the gun that they saw was in the possession of the appellant; that he and he only did any shooting.

The appellant himself, while a witness, did not claim that deceased had a gun, or that he ever got possession of appellant's gun. The affidavits are so widely at variance with the actual facts as they were told on the trial that we think they may be wholly discredited. Those witnesses that testified did say that Mrs. Danner was pleading not only with the appellant, but with her husband, to desist from further trouble. The language that she used in addressing each of the combatants was variously stated by the witnesses, but none of them testified that she asked her husband not to shoot.

The learned judge who heard all of the evidence was well qualified to pass upon the weight and sufficiency of the affidavits, and we are satisfied that his disposition of them was correct.

Beurette De Berry made an affidavit upon the motion for a new trial to the effect that Kate Rose, a witness for the prosecution, after hearing of the verdict of the jury threw herself upon a bed and cried and sobbed; that he spoke to her, saying that there was no use crying, that neither she nor himself nor anyone else could help it now; whereupon she said, "If you had sworn to a bunch of falsehoods against Talley as I did, you would cry too." The only thing that Kate Rose testified to was that she was present when appellant said to Pearl Johnson, "I will get even with Mr. Danner." That statement was made to the jury under the solemnity of an oath. It does not stand alone; it is supported by corroboration. If she said to De Berry what is charged, it was not under the sanctity of an oath, nor does anyone corroborate De Berry that she ever said it.

Appellant, while a witness in his own behalf, testified that the deceased bit the index finger of his right hand. The prosecution in rebuttal of this statement by appellant, as to his finger being bitten by deceased, placed Dr. C. B. Wiley upon the stand. He testified that on the following day after the trouble he was called professionally to the aid of appellant. The doctor testified that appellant told him that he had had an infected finger in the neighborhood of a month; said that he examined the finger and found "a cut which appeared to be from an old infection. . . . It had granulated tissues in it, which would go to show it had not been very

XVIII Ariz.—21

recent. . . . In order for a wound to be granulated, it would be necessary to be sore for at least a week.''

The affidavits of H. S. Hovey and Mrs. J. H. Medlin filed upon the motion for a new trial stated in effect that they personally knew that the index finger of the right hand of appellant had thoroughly healed prior to the trouble, and that it had no sore or bruises upon it whatsoever prior to the eighteenth day of November, 1913. Hovey states, in addition: ''I saw the said Jesse Danner biting the said index finger of the right hand of Robert Dayton Talley.'' This witness was on the stand and testified; he says he did not tell what he saw to any person or persons prior to the verdict in the case.

What the appellant now seeks to show about the condition of his finger by Hovey and Mrs. Medlin, it would seem, could have been amply sustained at the trial. He then certainly knew, and his intimate friends and associates must also have known, whether his finger was sore and bruised just before the trouble or not. The opportunity was then open to disprove statements of Dr. Wiley, and it was his duty to make his proof at that time.

As to all of these affidavits filed in support of the motion for a new trial and as to the disposition of the motion, we add, with approval, to what we have said, a quotation from *State* v. *Fleming,* 17 Idaho, 471, 106 Pac. 317:

''The granting of a new trial upon the ground of newly discovered evidence is largely a matter of discretion, in the exercise of which this court will not disturb the order of the trial court except in case of abuse clearly disclosed by the record. A new trial should not be granted in a case where the party has not shown due diligence in discovering and producing the evidence, nor where the evidence is purely cumulative or contradictory, nor unless the newly discovered evidence is such as to render a different result upon a retrial probable. To entitle the defendant to a new trial upon the ground of newly discovered evidence, it must appear from the affidavits presented that the new evidence is not cumulative merely, that it is such as to render a different verdict reasonably probable upon a retrial, and that the evidence could not with reasonable diligence have been discovered and produced at the trial.''

One of the grounds upon which the new trial was requested was that the evidence did not support the verdict. That was a question for the jury. It was resolved against the appellant. There was ample evidence to sustain the verdict. The jury saw all the witnesses who testified, heard their statements of things they saw, and knew as they fell freshly from their lips. They must have concluded that the prosecution's theory that appellant was harboring a feeling of hate and revenge against Danner for interfering with him and Ethel Spencer was true; that it was to carry out a preconceived plan that he went forth that fatal night armed and at his first opportunity grossly insulted the deceased for no other purpose than to induce the fight and take his life under the claim and pretext of self-defense.

During the time that this case has been pending here on appeal, it was discovered that the minutes of the trial court showed that the appellant was tried by only eleven jurors. This fact was called to the attention of the Attorney General, who in turn brought the matter to the attention of the county attorney of Gila county, who thereupon, after notifying the attorney of record for appellant, moved the trial court to amend its minutes in conformity with the actual facts. The minutes as amended have been certified to this court, showing that in truth and in fact the jury that tried appellant was composed of twelve men. The error in the original minutes was purely a clerical one, and consisted of the clerk in writing down the names of the jurors omitting the name of one who actually served in the case. Appellant has not suggested or contended that he was not tried with twelve jurors, nor has he at any time since the misprision of the clerk was discovered by the court urged upon us that this clerical mistake has in any manner prejudiced his rights. We mention these facts as a part of the history of the case since pending in this court, and as an admonition to the clerks of trial courts of the necessity of carefully and accurately keeping their minutes and not because we think it has any bearing upon the merits of the case.

Judgment is affirmed.

FRANKLIN, J., concurs.

CUNNINGHAM, J. (Dissenting).—The court instructed the jury as to the law (paragraph 172, Penal Code of Arizona 1913) defining the degree of murder, by reading the statutory words, and added thereto the following:

"You will thus see that included in the charge contained in the information is that the defendant is guilty of murder in the first degree."

This statement is assigned as error. The court may have, and probably did have, the intention of saying to the jury that:

"You will thus see that included in the charge contained in the information is that the defendant is thereby charged of having committed the crime of murder of the first degree."

He could have so instructed the jury and thereby correctly instructed them.

Did they so understand the instruction given, from the language used by the court? The answer must be formed from the results of speculation, unless the court, in the instructions given, stated the law otherwise.

The language used, certainly, informs the jury as a fact "that included in the charge contained in the information is that the defendant is guilty of murder in the first degree." Not that the defendant is charged by the information of the crime of murder of the first degree, but that he is guilty of murder in the first degree according to the charge as set forth in the information.

The connection in which this instruction stands with regard to the entire instruction given is therefore important. I will briefly refer to such portions of the instruction as bear upon the matters affected by this alleged erroneous statement. The only matter affected is the matter of the degrees of murder.

The court commenced the instructions by reminding the jury that the information had been read in their hearing, and stated the contents of the allegations of the information in substantially the language of the information, and stated, "The defendant is thus charged with the crime of murder." The court then informed the jury of their duty:

"Before you proceed upon an investigation of the truth or falsity of the charge contained in the information, it is necessary that you be instructed upon some of the preliminary

steps which you must observe in arriving at a final conclusion under the evidence, which you have been listening to, and the information, which you have heard read.''

The court instructed of the necessary existence of act and intent, or act and criminal negligence to constitute a crime; of the power of the jury in weighing the evidence and arriving at its truth, and the rules to be followed in so arriving at the truth; of the presumption of defendant's innocence until the contrary is established, and in case of a reasonable doubt whether his guilt be satisfactorily shown he must be acquitted; ''and it is incumbent upon the state in this case to satisfy you beyond a reasonable doubt of the truth of every material allegation in the information which you have heard read''; of the meaning of reasonable doubt:

''You must understand, however, gentlemen of the jury, the law does not require that every doubt of guilt should be excluded; that would require an impossibility of the state. Crimes are not usually committed under circumstances which permit of demonstrative proof. In the determination of criminal cases it is seldom possible to be absolutely certain. You are required to decide the question of the defendant's guilt or innocence upon the evidence, under the law, using those reasoning faculties with which you have been endowed, and determine whether the state has proven the defendant guilty, not beyond all doubt or possibility of error, but beyond a reasonable doubt.

''You are instructed . . . that it is the law in this state that, if you find from the evidence that Robert Dayton Talley fired the fatal shot which killed Jesse C. Danner, then the burden of proving circumstances of mitigation, or that justify or excuse the homicide, devolves upon Robert Dayton Talley, unless the proof upon the part of the prosecution tends to show that the crime committed only amounts to manslaughter, or that the defendant was justifiable or excusable. Where it is shown from the evidence that a homicide has been committed with a deadly weapon, and no circumstances of mitigation, justification, or excuse appear, the law implies malice. The malice thus implied is that malice aforethought which is necessary to sustain an indictment for murder.

''Having thus been instructed upon what are the preliminary steps in arriving at a just conclusion in criminal cases,

you may proceed to an investigation, gentlemen, and in so doing it is well to observe certain rules. You should first consider . . . whether or not Jesse C. Danner is dead. Second, if you so find from the evidence beyond a reasonable doubt, did he die within a year and a day of the time of the infliction of the wounds upon him, and that the wounds were inflicted by the defendant, Robert Dayton Talley, in Gila county, Arizona, as you will be hereafter more fully instructed.

"As I have heretofore instructed you, the defendant in this case is charged with having on or about the eighteenth day of November, 1913, murdered one Jesse C. Danner, a human being."

The statutory definition of murder is then given. This is followed by the instruction stating the statutory definitions dividing murder into the first and second degrees, followed by the instruction complained of, viz.:

"You will thus see that included in the charge contained in the information is that the defendant is guilty of murder in the first degree."

Immediately following, the court instructed as follows:

"Before you will be justified in finding that the defendant is guilty of murder in the first degree, you must find, beyond a reasonable doubt, that the killing was done with malice aforethought; that such killing was willful, deliberate and premeditated, as there is no evidence in this case which would justify your consideration of any other of the elements which constitute murder in the first degree."

The court defines malice, and malice aforethought, and states that "deliberation and premeditation need not exist for any fixed period of time; it is enough that they were formed before the act"—clearly making proof of the existence of malice aforethought, as defined, include deliberation and premeditation.

The court defines willfulness, and states that the meaning excludes accident, but:

"It must be deliberate and premeditated. By this is not meant that the killing must have been conceived or intended for any particular length of time. Deliberate and premeditated do not necessarily mean brooded over, considered, or reflected upon for a week, a day, an hour or any particular

length of time. It is sufficient that it should be done with reflection and conceived beforehand, and in this view the deliberate purpose to kill and the killing may follow each other as rapidly as successive impulses or thoughts of the mind. It is enough that the party deliberate beforehand, premeditate the purpose to kill before he gave the fatal blow; but, while the purpose to kill and its execution may follow thus rapidly upon each other, it is proper for you to take into consideration the shortness of such interval in considering whether such sudden and speedy execution may not be attributed to sudden passion and anger, rather than to deliberation and premeditation, upon which you will be hereafter more fully instructed. Thus, should you be satisfied beyond a reasonable doubt, that Robert Dayton Talley willfully, unlawfully, feloniously and of his premeditated malice aforethought did kill Jesse C. Danner, as you are herein instructed, in such case you should find the defendant guilty of murder in the first degree.

"From what has been said you will see the distinction between first and second degree murder is that murder in the first degree, unless committed in the perpetration of or attempt to perpetrate arson, rape, robbery, burglary or mayhem, which elements do not enter into this case, is the killing must be willful, deliberate and premeditated; while in murder of the second degree the killing is not deliberate and premeditated. In the one case, there is a deliberate, premeditated and preconceived design, though it may have been formed in the mind immediately before the mortal wound was given, to take life. In the other case, there is no deliberation, premeditation or preconceived design to kill. In both, however, murder in the first degree and murder in the second degree, the killing must have been unlawful and accompanied with malice.

"If you have a reasonable doubt . . . of the guilt of the defendant of the crime, either of murder in the first or second degree, there is still included within this charge the lesser offense of manslaughter."

Whereupon the court instructed upon the law of manslaughter and on the law of justifiable and excusable homicide, and the forms of verdict to be adopted. As a final instruction as to the degrees of murder, the court said:

"In considering the degree of the crime, . . . it is your duty to resolve any reasonable doubt as to whether or not the defendant is guilty of the higher offense, in favor of the defendant and in favor of the lesser degree of the crime, and, upon the whole case, resolve every reasonable doubt that may exist in your minds in favor of the defendant."

The cause was submitted, and the jury retired to consider of a verdict. At a later time the jury returned into court and requested a "definition between first and second degree murder; explanation of what constitutes malice aforethought and premeditation; also, the difference between malice and malice aforethought." The foreman stated the jury wanted the "difference between first and second degree murder." The court said:

"Sometimes, gentlemen of the jury, it is almost utterly impossible to be able to so give a definition that embraces law terms that a layman can understand; that is, it is hard, of course, even for lawyers and for judges who have spent probably years of their lives to get the distinction between the different elements constituting certain offenses so that it is absolutely clear even to their own minds. But in this state it may be well for you to understand that 'murder,' as I have heretofore defined that to be, is the unlawful killing of a human being with malice aforethought. That general definition embraces all classes of murder, as you have been instructed in the instructions that I have heretofore read to you —that is, first and second degree murder. In this state murder is divided into two degrees, first degree and second degree. Under the statute and under the law of this state, every murder which is perpetrated by means of poison or lying in wait, or by any other kind of willful, deliberate or premeditated killing, or which is committed in the perpetration of or attempt to perpetrate arson, rape, robbery, burglary or mayhem, is murder in the first degree; all other kinds of murder are murder of the second degree. From the evidence that has been introduced in this case, gentlemen of the jury, you are instructed that as a matter of law that that part of the definition which relates to murder in the first degree as that which is committed in the perpetration of or attempt to perpetrate arson, rape, robbery, burglary or mayhem, has no part in your deliberations at all, and may be excluded from

your deliberations entirely. Consequently, the only thing that you are concerned with in this definition of murder in the first degree is as to whether or not you are convinced beyond a reasonable doubt that this killing was willful, deliberate and premeditated to constitute murder in the first degree.

"I will again read you the definition that I gave you in the instructions I first read to you, as this instruction has been thought out carefully and worded in order to give expression to the meaning as near as possible."

The instruction theretofore given was read, including the instructions indicated and the instructions explaining the meaning of malice aforethought, and the distinction between malice and malice aforethought, and the following:

"Where it is shown from the evidence that a homicide has been committed with a deadly weapon, and no circumstances of mitigation, justification or excuse appear, the law implies malice. The malice thus implied is that malice aforethought which is necessary to sustain an indictment for murder."

Whereupon the jury retired and later returned a verdict of guilty of murder of the first degree, and fixed the punishment at death.

The sum and substance of the whole instruction given the jury, as they relate to the first degree of murder, is: That under the evidence in this case the jury is not concerned with murder committed in the perpetration or attempt to perpetrate arson, rape, robbery, burglary or mayhem, but they are only concerned with the homicides committed by any other kind of willful, deliberate and premeditated killing. That the state is required to prove every material allegation of the information to the satisfaction of the jury before a conviction can be had. "Where it is shown from the evidence that a homicide has been committed with a deadly weapon, and no circumstances of mitigation, justification or excuse appear, the law implies malice. The malice thus implied is that malice aforethought which is necessary to sustain an indictment for murder." That murder is divided into first and second degrees, but it is extremely difficult to express a clear distinction existing between the two degrees of murder. That under the law of this state, "that, if you find from the evidence that Robert Dayton Talley fired the fatal shot which

killed Jesse C. Danner, then the burden of proving circumstances of mitigation, or that justify or excuse the homicide, devolves upon Robert Dayton Talley, unless'' the proof of such mitigation, justification or excuse is furnished from the evidence produced by the state.

A fair construction of the instructions defining deliberation and premeditation is that such words are included in the definition of ''malice aforethought,'' viz.:

''You are instructed . . . that the term 'malice' denoted a wicked intention of the mind; an act done with a depraved mind attendant with circumstances which indicate willful disregard of the life or safety of others indicates malice, and that malice aforethought is such wicked intention of the mind previously entertained. Deliberation and premeditation need not exist for any fixed period of time; it is enough that they were formed before the act.''

The law of this state is that an act done with a depraved mind attendant with circumstances which indicate disregard of the life or safety of others indicates malice, and, before a homicide may be considered murder, the act resulting in the homicide must have been accompanied by malice so understood manifest from the facts and circumstances of the killing.

The facts that establish malice aforethought, in order to constitute a homicide murder, do not also establish the further elements of willfulness, deliberation and premeditation, and thereby establish the higher degree of murder. In order to establish willfulness, deliberation and premeditation in the commission of a homicide (in order to establish murder of the first degree), the state must satisfy the jury from further evidence, beyond a reasonable doubt, that the fatal wound was inflicted in such circumstances as exemplify not only the offspring of a depraved mind bent on mischief, but also such further state of mind acquired from a previous deliberation and premeditation of the act, and a fixed purpose and intention of bringing about the exact result (the death of the human being wounded). To establish these elements of deliberation and premeditation, the prosecution must produce evidence of a greater degree of depravity of mind than is required to establish an unlawful killing with malice aforethought. In other words, the evidence must

satisfy the jury beyond a reasonable doubt that the accused not only killed the deceased of his malice aforethought, but, also, that the act of killing was willfully, deliberately and premeditatedly done. Hence a greater degree of punishment is deserved, because a greater depravity of mind is shown to have accompanied the act of killing.

The instructions given nowhere required the jury to become satisfied from the evidence, beyond a reasonable doubt, that the accused willfully, deliberately and premeditatedly shot and killed the deceased. The instructions did require the jury to become satisfied of the existence of such elements, beyond a reasonable doubt, but instructed the jury that, from a definition of the degrees of murder as given by the court, "you will thus see that included in the charge contained in the information is that the defendant is guilty of murder in the first degree."

Who can say at this stage of this cause that the jury was or was not influenced by such instruction?

The evidence shows no reasonable motive prompting defendant to a willful, deliberate and premeditated act of shooting deceased. That the accused did shoot deceased is not denied. The circumstances surrounding the fatal transaction tend to show that the parties were engaged in a fight, and continued fighting with about equal success for some minutes; that the accused was prostrate on the ground in a muddy street, and the deceased was on "top" of him, and both were fighting; that bystanders took hold of the deceased and pulled him back, but did not break the hold each had on the other. They were partially disengaged, so that both men recovered a standing position, but holding to each other's arms. At about the time they arose to their feet, defendant pulled a revolver from under his left arm, where he usually carried it, and the deceased made a jump toward defendant, at the same time saying to defendant, "Put up that gun, fight like a man," or words to that effect. As deceased made the jumping motion, as if to disarm accused, the accused passed his right hand, with the revolver, over the deceased's left shoulder and pressed the muzzle against the back of the deceased and fired. Then he fired two more shots into the deceased's left side, whereupon the deceased retired toward the

sidewalk, showing a great weakness. Defendant fired a fourth shot in his direction, but did not again strike the deceased.

There is no evidence as to which of the three shots was fatal. The three combined proved fatal, and the jury is fully justified in finding that the shots caused the death. No witness testified directly of the cause of death. The wound in the back and the two wounds in the side were powder-burned.

This evidence would justify an inference that the defendant fired the shots intending thereby to kill the deceased, and in so doing he was prompted by and did fire the shots of his malice aforethought. He thereby unlawfully killed Jesse C. Danner, a human being, with malice aforethought. Of this conclusion the facts and circumstances surrounding the killing furnish sufficient proof, if the jury did not believe that the shots were fired by accused in his necessary self-defense. Whether or not the facts and circumstances surrounding the killing tend to prove that the accused willfully, deliberately and premeditatedly fired the shots, I will not now stop to inquire. Certainly the above-mentioned facts do not justify the fair inference of deliberation and premeditation necessary in law to raise the crime to murder of the first degree. The jury had doubts of the degree of murder established by the proof; but as the court had instructed them that, "you will thus see that included in the charge contained in the information is that the defendant is guilty of murder in the first degree," and treated deliberation and premeditation as included in malice aforethought, and nowhere required the jury to become satisfied beyond a reasonable doubt from the evidence in the case that the accused willfully, deliberately and premeditatedly fired the shots that killed Danner, they may have thought the court had intended by the instruction to inform them of their duty to convict of murder of the first degree if they were satisfied beyond a reasonable doubt, from any source, that the defendant deliberately and premeditatedly fired the shots that proved fatal. They were expressly told, if accused fired the fatal shots, he had the burden of proving that he fired them in such circumstances as relieved him from the extreme penalty of the law. What could a jury do in case they did not believe the defendant's statements claiming he fired, but fired in self-defense,

under these many instructions, other than convict of murder of the first degree, and particularly when the court had intimated the absence in law of the existence of a certain line marking a distinction between the first and second degrees of murder?

We may as fairly speculate and determine, from the whole of the instructions given, that the defendant was or was not injured by the instruction in question. Certainly the instruction has nothing to recommend its presence in this trial. This considered, and the imperfect condition of the record presented to us for review of this appeal, convinces me that justice, administered with mercy, requires another trial.

The entire record presented to us for review is prepared and presented with such absence of care and attention to plain statutory requirements that only charity toward the appellant in his extremity prompts us in giving any consideration whatever to the record other than to order the appeal dismissed. Yet, the defects in the record are, and have been, such for which the appellant and his counsel are not to be censured. The censure falls upon those over whom appellant has no control. Such record as we have had for consideration, and particularly the evidence contained in the reporter's transcript of his notes, has been considered as an authentic, correct transcript, and treated as correctly containing all of the evidence in the case and the entire instruction of the court, not because it has been authenticated as such by the officers designated by statute in the exact manner and with the formalities specified by statute to so establish it as a part of the record, but because the appellant in right and justice ought not be penalized for another's failure of duty; appellant being without fault. In taking this course, I feel that the broad spirit of our statute has been met, and by meeting the statute in this way its beneficial purposes have been promoted, not violated. I am of opinion that by this course we have not thereby nullified our previous decisions in similar cases, but entered a field not covering those previously decided cases—the facts maturing the record are so very different.

Upon the whole case, I am convinced that the appellant has been deprived of that fair and impartial trial guaranteed to

him by law, because the court erred in its instructions to the jury, under the evidence.

For this general reason, I dissent from the decision affirming the conviction.

---

Generally, on the question of cumulative evidence as grounds for new trial in criminal cases, see notes in 14 L. R. A. 609; 46 L. R. A. (N. S.) 903. And as to circumstances under which cumulative evidence has or has not been held to render a different outcome probable, see note in 46 L. R. A. (N. S.) 911.