[Criminal No. 584.   Filed November 3, 1924.]

[229 Pac. 1028.]

SAM FLOWERS, Appellant, v. STATE, Respondent.

1. CRIMINAL LAW—ASSIGNMENT, BASED ON AFFIDAVIT COMPLAINING OF EXCLUSION OF EVIDENCE, OVERRULED AS NOT COMPLYING WITH STATUTE.—Assignment of error based on affidavit complaining of exclusion of certain evidence must be overruled, where affidavit was not tendered to prove offer in open court and was not in form of bill of exceptions or statement of facts as required by Civil Code of 1913, paragraph 602 et seq., not being authenticated or approved by trial judge.

2. HOMICIDE—EXCLUSION OF EVIDENCE HELD NOT ERROR IN VIEW OF RECEPTION OF OTHER TESTIMONY TO SAME EFFECT.—In murder prosecution, where self-defense was interposed, assuming that fact that deceased served term in penitentiary shed light upon accused's mental state at moment of homicide, exclusion of evidence of such imprisonment *held* not prejudicial, in view of other testimony to same effect.

3. HOMICIDE—UNPROVOKED KILLING OF BAD MAN IS NO LESS MURDER THAN KILLING OF PEACEFUL CITIZEN.—The unprovoked killing of a bad man is no less murder than the killing of the most peaceful and law-abiding person in the community.

4. HOMICIDE—THAT ACCUSED'S WIFE WAS EMPLOYED AS COOK IN HOUSE OF ASSIGNATION, OR REFUSED HUSBAND'S REQUEST TO

─────────

3.   See 13 R. C. L. 916.

LEAVE, HELD NOT TO JUSTIFY KILLING HER.—Fact that accused's wife was employed as a cook in a house of assignation, or that she did not heed his request to leave such place, did not justify defendant in killing her.

5. CRIMINAL LAW — REMARKS OF PROSECUTING ATTORNEY TO JURY WITH REFERENCE TO MATTERS NOT TESTIFIED TO, HELD NOT REVERSIBLE ERROR.—In murder prosecution, where there was testimony that deceased had been shot in her hand and that at that time she had a book and pencil in her hand, but there was no testimony that hole in book, or mark on pencil, was caused by bullet, remarks of prosecuting attorney directing jury's attention to condition of such articles, and inquiring of jury as to what caused hole in book, with assertion that mark on pencil must have been made by bullet, *held* not reversible error.

6. CRIMINAL LAW—ASSIGNMENT BASED ON TESTIMONY NOT OBJECTED TO UNTIL AFTER WITNESS ANSWERED MUST FAIL.—Assignment based on testimony not objected to until after witness had answered question must fail.

7. CRIMINAL LAW—NEW TRIAL NOT TO BE GRANTED SOLELY UPON IMPEACHING OR CUMULATIVE EVIDENCE, NOR UNLESS NEW EVIDENCE WILL CAUSE DIFFERENT RESULT UPON RETRIAL.—A new trial ordinarily should not be granted solely upon impeaching or cumulative evidence, nor unless the showing is such as to render a different result upon a retrial probable.

8. CRIMINAL LAW—REFUSAL OF NEW TRIAL FOR NEWLY DISCOVERED EVIDENCE HELD PROPER WHERE RESULT WOULD NOT BE CHANGED.—Refusal of trial court to grant new trial on ground of newly discovered evidence *held* wise exercise of discretion, where it appeared newly discovered evidence would not change verdict.

See (1) 17 C. J., p. 179.   (2) 17 C. J., p. 335.   (3) 30 C. J., pp. 37, 174.   (4) 30 C. J., pp. 37, 174.   (5) 16 C. J., p. 896.   (6) 16 C. J., p. 874.   (7) 16 C. J., pp. 1199, 1202.   (8) 16 C. J., p. 1206.

APPEAL from a judgment of the Superior Court of the County of Pima. George R. Darnell, Judge. Affirmed.

Mr. James D. Barry and Mr. John H. Martin, for Appellant.

Mr. John W. Murphy, Attorney General, and Mr. A. R. Lynch, Mr. Earl Anderson, and Mr. E. W. McFarland, Assistant Attorneys General, for the State.

7. See 20 R. C. L. 294, 295.

ROSS, J.—Defendant appeals from a conviction of murder and a death sentence, and also from an order overruling his motion for a new trial. Upon his trial he admitted he committed the homicide, but claimed he did it in self-defense.

The deceased, the defendant, and all of the eye-witnesses to the killing are colored people; defendant and deceased being husband and wife. They were married in 1915 in Texas, and came to Tucson, Arizona, in 1919. According to defendant's story their married life had been neither happy nor peaceful. They had quarreled and fought, made up, and quarreled and fought again, at irregular intervals during their entire married life. It was five or six months after their marriage that the deceased assaulted defendant with a razor and inflicted on his neck a serious wound. Another half year passed, when he escaped the same or worse treatment from the deceased by outrunning her as she pursued him with a butcher-knife. Later he was saved from being shot by the police intercepting his wife and taking from her a pistol. In 1918, because defendant wanted to go to Wichita Falls on business, deceased went to the train, where she found him, and with a pistol in her hand "ran him four or five miles up the railroad track until the train left."

These are not by any means all the troubles of their married life. They are only a few, according to defendant's testimony. Their troubles continued until on February 20, 1923, defendant put a stop to them by shooting his wife to death in the manner stated a little further on.

As a result of their difficulties, they separated frequently, and lived apart a large portion of the eight years of their married life.

At the time of the homicide defendant was employed at the Congress Hotel, in Tucson, as night

porter, where he had been working for some time.
The deceased was cooking, and had been cooking,
for one Florence Marquis, from some time in De-
cember, 1922. At this time they were not living
together, although they frequently met. It is shown
that defendant quite often went to the Marquis place,
where deceased was cooking, and had meals with
her, and one time was there nursed through a slight
illness.

Defendant claimed that Florence Marquis was
running an assignation house, or house of prostitu-
tion, and the evidence, we think, pretty conclusively
established that as a fact. The defendant assigned
that as the reason he objected to his wife work-
ing there. The deceased, shortly before February
20th, saw a local justice of the peace, and asked that
defendant be put under a peace bond. On the after-
noon or evening of the 19th of February, defend-
ant, after seeing the justice of the peace, called
upon the Marquis place over the telephone, and when
it was answered by Florence Marquis, he asked her
(so he says) "what she meant by putting me under
a peace bond." Whereupon Florence Marquis an-
swered, "Because she (deceased) don't want you,
and is going to have you run out of town." That
night, and after this conversation, defendant wrote
deceased, and caused to be delivered to her by
messenger, the following letter:

"Hello Mrs. Flowers cind frend how are you this
morning this leave me felling afuly sore with you
as you are trying to make peple think that I am
trying to force you to live with me I only told you
that I would not stand for you to live there an if
you was a woman you be to glad to now that I
had that much respect for you must lest that in
erther words I want you to quit telling peple that
I am going to kill you I told you that killing was
to good for you so as you think that Ted (Florence

Marquis was also known as Ted) has the Law in her power an can have me put under a peas bond that allwright I Will see about that you had her to ring the jesters (justice) but that all OK that shows what Controll that woman has of you I sent for you an told you jest what I meant an you said that you would leave so I told you that that would suit me so you Wanted to go Sunday an I told you to wain untill monday so you agreed an then you went Back and told Tedy (Florence Marquis) that I said that I was going to kill you but Dont forget What said about you staying there I Dont mean to hurt you Either but this is something must rite to all the old friends and tell them about so I say hello and good by S. F. you will need me before I will you and Dont forget that old friend.''

In the afternoon or evening of the 20th, defendant called deceased over the telephone, and this conversation took place:

''So I asked her was she busy. She says she was at the time. I asked her if she was going to be busy all night, if she wasn't I wanted to see her. So she said she suspected she would be busy. So we passed a few other words, I don't remember what they were, but she said, 'Good-by,' so I hung up.''

The time of this telephone conversation was not given, but it was after 4 P. M., as defendant says he slept until that hour. He says he was drinking during that afternoon, so that when his hour to go to work (7 P. M.) arrived, because his boss had forbidden his working while intoxicated, he got another man to take his place for the night, and that he left the hotel about 7:15. It was 8:30 or 9 o'clock when he arrived at 136 West McCormick Street, where the killing took place. This place was occupied by a negro family, with whom both the defendant and the deceased were on friendly terms. Defendant had been there at about 5 o'clock that afternoon, and had talked to some of the occupants.

When he called at this place the second time, the deceased was there visiting. Beside her there were two other women and one man in the house, sitting around the dining-table in the dining-room. Their names were Jeanette Adams, Hattie Johnson and Aaron Watson. This room was the second room from the front door entrance.

The state's evidence is that the front door was locked by means of a sliding bolt, and that a crash of glass being broken was heard; the door having a glass panel. The evidence was that a glass square, about six by six inches, just over the doorknob, was broken; the glass being upon the floor. Immediately after the crash was heard, the defendant appeared in the room where all these people were sitting. The deceased had just taken into her hands a pad and pencil, preparatory to writing a letter for Hattie Johnson. She had written the words, "Tucson, Arizona." She was sitting at the time. The defendant said to her, "Mrs. Flowers, I can't get to speak to you, can I?" at the time drawing his pistol and shooting her twice while she was still sitting, and several times after she had risen, emptying his pistol into or at her body.

The defendant's version is that he did not know his wife was in the house; that he was admitted by one of the inmates; that he greeted everybody in a friendly way, and turning to his wife upbraided her for refusing over the telephone earlier in the evening to see him; that she jumped up and threw down a book, or whatever she had in her hands; that everybody then jumped up, and that Hattie Johnson knocked him back on a trunk; that he got up off of trunk, and his wife was coming at him with her hands in her bosom, and he "just pulled his pistol out of his pocket and began shooting."

The deceased was shot (1) midway between the nipples, through the breast-bone, (2) in the left arm,

fracturing the humerus, (3) three times to the left of the umbilicus, taking a downward course to the right, and (4) there were three gunshot wounds in the right hand.

Policemen Barton and Smith heard the shots, and were at the scene very quickly thereafter. Defendant surrendered without resistance, and gave over to them his pistol. He said to them:

"Everything is all right, I just killed my wife. She has been living with a whore."

Policeman Barton, who took defendant to jail, said:

"He told me that he was sorry that he didn't catch his wife and Frenchy, this woman known as Florence Marquis. He was sorry that he didn't catch the two of them together, so he could kill the two of them. And then I asked him, when he used this word 'Frenchy,' I says, 'Who do you mean?' And he says, 'Florence Marquis.'"

After the body of deceased was removed to an undertaker's, there was found under and inside her clothing near the skin at the waist line a razor.

With the above statement of facts in mind, we will now take up and pass upon the assignments of error.

It is contended that the court erred in refusing to allow defendant to prove by a record from a Texas district court that deceased had been indicted for murder, and tried, convicted and sentenced to five years' imprisonment in a Texas penitentiary. We have looked through the transcript of the evidence as taken down by the court reporter and do not find any record of any such offer of proof. The trial was had on May 22d and 23d, 1923. Among the files is an affidavit of defendant's attorneys with the file-mark of the clerk of the superior court thereon, dated June 8, 1923, stating that said attorneys attempted to introduce evidence of such

conviction, but, upon objection, were not permitted
by the court to do so; that thereafter, during the
trial, in the chambers of the presiding judge, the
county attorney being present, the admissibility of
such evidence was discussed by counsel for both par-
ties and at the close of the discussion the judge
ruled against its admission. Besides not being ten-
dered to prove an offer in open court, the evidence
of which had not been preserved, this affidavit is
not in the form of a bill of exceptions or a state-
ment of facts, as required by paragraph 602 et seq.,
Civil Code of 1913. It is not authenticated in any
way, neither is it approved by the judge of the
court. The assignment must therefore fail.

It is next contended that the court erred in not
permitting defendant to show of his own knowledge,
obtained from letters received from deceased while
she was an inmate thereof, that she had been in
prison in Huntsville, Texas, and in striking out an
answer of defendant's to that effect. If the fact
that deceased had served a term in a Texas peni-.
tentiary could be of any advantage to defendant
or shed any light upon his mental state at the mo-
ment of the homicide, we think he got it. He testi-
fied that he met deceased in Dallas, Texas, in 1908;
that at the time both were unmarried; that he knew
her a short while then; that he did not see her
from 1908 to 1914; but that they corresponded while
she was in prison "between 1908 and 1914." In
a separate question the defendant was asked. the
place of deceased's imprisonment, and he having an-
swered, "Huntsville," upon motion this answer was
stricken. The rest of the evidence on that question,
however, remained undisturbed.

Whether the defendant at the time he shot the de-
ceased was really and honestly apprehensive of dan-
ger from her was the question. He was permitted to
describe in great detail to the jury his many narrow

escapes from death or great bodily harm at the hands of deceased. It was in evidence that she had inside her clothes, at the time defendant shot her, or at least when the body was undressed, a razor, a weapon of defense and offense common to her nationality. So it may be assumed that the jury was satisfied deceased was a turbulent and dangerous woman, and still unsatisfied that defendant was in danger, real or apparent, or that he felt or believed himself to be in danger of death or great bodily harm at the time he killed his wife. He had been able without resort to firearms to protect himself against all her previous efforts to kill him, and he had managed to escape from all harm except on 'one occasion. When he shot her she had exhibited no weapon; he did not even know if she had one.

It was necessary to shoot deceased six or seven times, he would have the jury believe, in order to protect himself from her, when as a matter of fact he might have pacified her by a kind word, or restrained her with his hands, or he could have passed out of the door he had just before entered without invitation, if not forcibly.

" . . . The unprovoked killing of a bad man is no less murder than the killing of the most peaceful and law-abiding person in the community." 30 Corpus Juris, p. 174; *Campbell* v. *Territory*, 14 Ariz. 109, 125 Pac. 717.

The defendant offered to prove by Policeman Barton that Florence Marquis was conducting a house of prostitution or assignation, and he now complains that he was not allowed to do so. Clearly this fact, if true, would not justify, or in any way mitigate, defendant's act. Defendant would have no right to kill his wife because she was employed as a cook in a house of prostitution or assignation, or because she did not leave the place when requested by him to do so.

It is complained that the court erred in permitting the assistant county attorney, in his argument to the jury, to demonstrate by certain exhibits in the case certain facts not brought out in the evidence, or testified to in the case. The statements objected to were comments upon the condition of the letter pad and lead pencil deceased had in her hands when defendant shot her, and what they showed. We quote the language criticised:

"Mr. Kempf: The deceased woman, according to the testimony in this case, was writing a letter. The testimony further shows that she had only written the words, 'Tucson, Arizona,' at the top of the page when the shooting occurred. She was in the act of writing this letter when the shooting took place, and here is the mute evidence in the case that corroborates the testimony of those eye-witnesses that so testified. Here is the book. What is that but a bullet hole. Here is the broken pencil, a mark upon the point of the pencil, broken by the force of the bullet."

The objection was that no witnesses had testified that the hole in book was a bullet hole, or that the pencil was broken by a bullet, and that therefore the attorney's allusions were unwarranted. These articles were in evidence, and the attorney directed the jury's attention to their condition, and inquired of the jury their opinion as to how the hole in book came to be, with the assertion that the mark on pencil must have been made by a bullet. There was testimony that deceased had these articles in her hand, and that her hand had been shot. As to what made the hole in book or mark on pencil, the jury was probably as competent to say as anyone else, especially under the circumstances.

The county attorney in cross-examining defendant asked if he was in the army during 1917, to which his reply was negative. He was then asked if he "were under 31 at that time." His attorney ob-

jected to this question, and it was neither ruled upon
nor answered. It is now argued that the court
erred in permitting the inquiry as to whether the
defendant was in the military service, especially so
since two of the jurors had been in the service. The
testimony now objected to was let in without objec-
tion, and the assignment must fail.

The court's order overruling motion for new trial,
based on grounds of newly discovered evidence ma-
terial to the defense, is also assigned as error. The
supporting affidavit of motion was made by one Ed-
ward Allen, and was to the effect that Margaret
Gill in the presence of Hattie Johnson had said to
Allen, the morning following the homicide, that she
was present when defendant arrived at house just
before the killing, and that he entered the house
through an open door while she was there. Sup-
porting affidavits of the defendant and his attorneys
are to the effect that they did not know at the
trial of such admissions to Allen, and could not
have known by diligence, and so forth. The trial
judge took oral evidence on this motion. This evi-
dence shows Allen was an inmate of the county
jail at the same time the defendant was confined
therein, and that they were in the same tank. The
learned trial judge was familiar with the situation.
He saw and heard the witnesses testify both in the
trial and on the motion for a new trial. He had
a better opportunity to account for the apparent
conflict of statements of the different witnesses, and
to reconcile them, than we have. In passing on the
motion he said:

"The court has spent some time in going over
the whole case, not only as to matters of law, but
as to matters of evidence, and the court is unable
to see where the defendant was prejudiced in the
least in the trial of this case. If I felt he was so
prejudiced, I would not hesitate to grant the mo-

tion for a new trial. . . . Believing that justice has been done, and substantially done, the motion as a whole is denied.''

The testimony of Allen, if true, would only impeach that of Margaret Gill and Hattie Johnson. A new trial ordinarily should not be granted upon impeaching or cumulative evidence only, nor unless the showing is such as to render a different result upon a retrial probable. *Talley* v. *State*, 18 Ariz. 309, 159 Pac. 59; *State* v. *Fleming,* 17 Idaho, 471, 106 Pac. 305; *Williams* v. *Territory,* 13 Ariz. 306, 114 Pac. 556; *High* v. *Territory,* 12 Ariz. 146, 100 Pac. 448; *Young Chung* v. *State,* 15 Ariz. 79, 136 Pac. 631.

We do not think the refusal by the trial court to grant a new trial was an abuse of discretion, but under the showing a wise exercise thereof. We think on a retrial, in view of defendant's explanation that he killed his wife because she was living with a whore, and because that is borne out by his conduct immediately before, at the time, and afterwards, it would make little difference to a jury whether he forced his way into the house, or was admitted by the inmates.

The judgment of conviction is affirmed, and the time for the execution thereof as originally fixed having passed, it is hereby ordered that judgment be entered fixing the time when the sentence of death shall be executed, as required by section 1177 of the Penal Code of Arizona of 1913.

McALISTER, C. J., and LYMAN, J., concur.